459 P.2d 98

RELIABLE ELECTRIC CO., a corporation, Appellant and Cross-Appellee,

v.

CLINTON CAMPBELL CONTRACTOR, INC., dba Phoenix Brick Yard, Appellee and Cross-Appellant.

No. I CA–CIV 684.

Court of Appeals of Arizona, Division 1.

Department B.

Sept. 29, 1969.

Rehearing Denied Dec. 3, 1969.
Review Denied Jan. 13, 1970.

McKesson, Renaud, Cook, Miller & Cordova, by J. Gordon Cook, Phoenix, for appellant and cross-appellee.

Fennemore, Craig, vonAmmon, McClennen & Udall, by Calvin H. Udall, Phoenix, for appellee and cross-appellant.

HAIRE, Judge.

Plaintiff filed this action to recover damages alleged to have been incurred when, due to an electrical malfunction, the dome on its brick kiln was spontaneously hoisted or raised beyond the normal limits, thereby shearing the lifting cables, and thus allowing the dome of the kiln to crash down, substantially demolishing the dome and the remainder of the kiln. The defendant-electrical company had designed and installed the electrical system involved pursuant to an oral agreement with plaintiff.

This case was tried to the court sitting without a jury, and resulted in a judgment for the plaintiff. The trial court made and entered thirty separate findings of fact and found the defendant liable on four separate bases, any one of which, if valid, would adequately support the judgment entered. These four bases of liability were set out in the conclusions of law made by the trial court and are generally as follows:

1. That defendant breached its implied warranty to plaintiff that the design and installation of the kiln electrical system would be done in a reasonably prudent, skillful and workmanlike manner, and that plaintiff relied on the skill and experience of defendant to design and install this system.

2. That defendant breached its implied warranty that the components of the electrical system sold and installed by defendant were reasonably fit or adequate for the purpose of performing the function for which they were intended by the parties, and that plaintiff relied on that warranty.

3. That defendant was negligent in the design and installation of the system in failing to use reasonable care and in the violation of provisions of the National Electric Code adopted as a part of the Code of the City of Phoenix.

4. That the facts and circumstances found by the court render applicable the doctrine of strict liability in tort.

Most of the controversy on appeal relates to the sufficiency of the evidence to support the findings of the trial court. The trial was lengthy, with both parties presenting testimony from expert and lay witnesses. We have read the entire transcript and find substantial evidence to support each fact found by the trial court. We were aided in this regard by the detailed analysis and citations to the transcript set forth in the plaintiff-appellee's brief.

■ There were many conflicts in the evidence and in some instances there was substantial evidence to support the contentions made by the defendant. However, Rule 52(a), Rules of Civil Procedure, 16 A.R.S., provides that:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."

A finding of fact cannot be "clearly erroneous" if there is substantial evidence to support it, even though there also might be substantial conflicting evidence. The resolution of any conflicts in the evidence is for the trier of fact. Bohmfalk v. Vaughan, 89 Ariz. 33, 357 P.2d 617 (1960).

■ It is uncontradicted that the spontaneous raising of the kiln dome resulted from an electrical short circuit caused by

the presence of rainwater in an exposed switchbox installed by the defendant. The trial court, considering conflicting evidence, found that the defendant had inserted a metal conduit into the top of the switchbox in such a way that rainwater could and did pass into the switchbox and accumulate on the conductors, wires, terminals, insulators and other components, through a hole in the switchbox made by defendant; that the installation in the foregoing manner was contrary to the requirements of good electrical construction practice of electrical contractors, was not done in a reasonable or prudent manner, and violated the standards of good workmanship or good practice applicable to electrical contractors in Phoenix, Arizona; that the plaintiff was unaware of the defect in workmanship and had relied upon the defendant to properly install the electrical system. In making these factual determinations, the trial court considered evidence offered by expert and lay witnesses for both plaintiff and defendant, and since there is substantial evidence to support the trial court's finding, we are not disposed to argue the evidence or attempt to determine what conclusion we might have reached if we had been the trier of fact.

Even in the absence of a specific contractual provision, the law implies a requirement that a contractor who undertakes to design and install an electrical system must do so in a good workmanlike manner and in a manner befitting a skilled contractor. Cameron v. Sisson, 74 Ariz. 226, 246 P.2d 189 (1952). Kuitems v. Covell, 104 Cal. App.2d 482, 231 P.2d 552 (1951). The defendant apparently does not quarrel with this legal principle, since ʿit' states in its reply brief, " * * * [W]hether the law be that of implied sales warranty or implied construction warranty, the duty is the same, which is to perform in a workmanlike manner, under the circumstances, and provide materials which are fit for the intended use." Once the defendant admits the validity of the above stated legal principle, it is difficult to ascertain the exact legal basis of defendant's contention that the trial court must be reversed, since the trial court found that defendant had breached this implied construction warranty, and this finding was based upon substantial evidence.

Defendant does contend that a power limit switch was suggested by defendant to prevent a spontaneous raising which might be caused by lightning or a power surge, but that this suggestion was rejected by plaintiff, who stated that the circuit breaker cutoff switch would always be turned to the "off" position when not in actual operation, and that therefore the power limit switch would be unnecessary. Again, the evidence is in conflict, but if we assume the truth of defendant's version of the facts as stated above, how does this aid defendant? The electrical malfunction which actually occurred with the resulting spontaneous raising was not caused by lightning or a power surge, but rather by defendant's faulty workmanship. By analogy, could it be reasonably argued that because an owner rejected a contractor's suggestion that a sprinkler system be installed in a building being constructed, the contractor would be excused from liability if defective electrical wiring installed by the contractor caused the building to burn down? By rejecting the power limit switch plaintiff was not assuming the risk that defendant would defectively install other components of the system.

Without question, the injuries to plaintiff's shuttle kiln were the direct result of and were in fact caused by defendant's faulty workmanship. However, defendant contends that in order for plaintiff to recover, it must be shown that defendant should have foreseen or recognized that the electrical short circuit caused by defendant's faulty workmanship could have spontaneously started the hoist motor.

Whether defendant's contention be taken as referring to proximate cause as an element of a cause of action in negligence, or to the question of damages, we believe that

the rule of foreseeability for which defend-ant argues is much too restrictive. The proper inquiry is whether defendant con-templated that the breach of warranty of workmanship might result in damage to the kiln and whether such damage was a natural and direct result of the breach. 77 C.J.S. Sales §§ 374, 381 (1952). Here defendant admittedly knew that an electrical short circuit could cause spontaneous operation of the hoist motor.[1] The evidence also establishes that defendant knew that the presence of water in the switchbox could cause an electrical short circuit.

■ In an action for breach of contract, the injured party is entitled to those dam-ages which arise naturally from the breach itself, or which may reasonably be supposed to have been within the contemplation of the parties at the time they entered into the contract. Jacob v. Miner, 67 Ariz. 109, 191 P.2d 734 (1948); Cole v. Atkins, 69 Ariz. 81, 209 P.2d 859 (1949); Thunder-bird Metallurgical, Inc. v. Arizona Testing Laboratories, 5 Ariz.App. 48, 423 P.2d 124 (1967).

We are of the opinion that under the circumstances of this case, the damages to plaintiff's shuttle kiln were the natural and direct result of defendant's breach and that it may reasonably be supposed that such were within the contemplation of the par-ties.[2]

Inasmuch as in our opinion the judgment of the trial court can be affirmed on the basis that the defendant breached its im-plied warranty of good workmanship, it is not necessary to discuss the law or the facts relating to the other theories relied upon by plaintiff. Mountain States Con-struction Co. v. Riley, 88 Ariz. 335, 356 P.2d 648 (1960).

Having determined that the judgment entered by the trial court against the de-fendant was proper and must be affirmed, we now consider the cross-appeal filed by the plaintiff.

In its judgment the trial court awarded plaintiff $15,008.00 for the cost of direct labor, parts and materials necessary to re-pair and restore the shuttle kiln, and $9,-030.33 for the actual excess cost of mate-rials and direct labor incurred by plaintiff in production from less efficient kilns dur-ing the estimated period required for repair of the damaged shuttle kiln.

In its cross-appeal plaintiff contends that the trial court erred in refusing to award damages for the cost of overhead and su-pervision allocable to the above mentioned direct costs. In substance, plaintiff's wit-nesses testified that costs for overhead and supervision were involved in producing the materials in the less efficient kilns and that a reasonable percentage figure for overhead to be added to the $9,030.33 awarded for actual excess cost of labor and materials would be fifteen per cent, and that this was a figure regularly used for that pur-pose in plaintiff's business; that in the brick industry in Phoenix, Arizona, there is a well-recognized percentage factor that is applied to labor and material contracts to cover supervision and overhead, whether for new construction or for repairs, and that this percentage likewise was fifteen per cent. Further, plaintiff's Exhibit 29 is an appraisal report prepared by independ-ent valuation engineers relating to cost of repair of the damaged shuttle kiln. *De-fendant* offered in evidence that part of plaintiff's Exhibit 29 which pertained to the estimated direct costs of the repair, labor and materials, and objected to the admission of that part of the exhibit which specified fifteen per cent of the total direct cost as and for the estimated cost of supervision and overhead. The court admitted the en-tire exhibit.

1. The testimony of defendant's president is that he did foresee the possibility that a short circuit caused by lightning or a power surge might cause spontaneous rais-ing.

2. On this appeal defendant has neither ob-jected to nor raised any question relating to the evidence considered or the amount of damages awarded by the trial court.

The defendant did not present any evidence to show that the percentages for the cost of overhead and supervision were unreasonable or to otherwise dispute these claimed damages. Defendant now contends that the trial court could, without any reason, reject the plaintiff's witnesses' testimony for the reason that the testimony of an interested party may be rejected when it is not corroborated by other evidence. Defendant further contends that in any event the cost of overhead and supervision would not be allowable because the trial court would have been justified in believing that plaintiff itself would have performed these repairs.

■ As to the first contention, defendant cites cases which state that notwithstanding a lack of contradiction, the trier of fact is not bound to accept the uncontradicted testimony of an interested party. Graham v. Vegetable Oil Products Co., 1 Ariz.App. 237, 401 P.2d 242 (1965); Carr v. Florian, 43 Ariz. 149, 29 P.2d 728 (1934). However, an examination of these decisions shows that they do not stand for the proposition that the trier of fact may arbitrarily and without any reason reject such testimony. In both of these cases there was other evidence before the court which casts suspicion or created doubt concerning the testimony of the interested party. As stated in Stanley v. Moan, 71 Ariz. 359, 361, 227 P.2d 389, 391 (1951):

"While it is the law that the commission may reject the testimony of an interested witness, it likewise is the law that it may not arbitrarily reject uncontradicted evidence when nothing intrinsic in the evidence itself or extrinsic in the circumstances casts suspicion thereon, Bragg v. Industrial Commission, 71 Ariz. 37, 223 P.2d 180; In re Gary's Estate, 69 Ariz. 228, 211 P.2d 815."

We think the rule is correctly summarized in M. Udall, Arizona Law of Evidence Sec. 3 at 10 (1960), as follows:

"As a general rule the jury or other trier of fact is the sole judge of the witnesses' credibility and is not required to accept the evidence of an interested party, even though uncontradicted. But this general principle is qualified by several important exceptions. The trier of fact may not arbitrarily reject uncontradicted evidence of a party when nothing intrinsic in the evidence itself or extrinsic in the circumstances casts suspicion upon it. Nor may it be rejected where it is corroborated by a disinterested witness or an independent document." (Footnotes omitted).

In the case at hand there are no facts in evidence or inferences which can be drawn from the evidence which contradict or cast the slightest suspicion upon the plaintiff's evidence relating to overhead and supervisory costs. Further, the testimony of plaintiff's officers is to some degree corroborated by Exhibit 29 in evidence as indicated above.

■ If we assume that the trial court disregarded this evidence because of defendant's contention that overhead and supervisory costs may not be allowed when the repair is performed by plaintiff itself, then the trial court was in error. It is well settled that a plaintiff may recover his overhead and supervisory costs notwithstanding that he makes the repairs himself. Baltimore & Ohio Railroad Co. v. Commercial Transport, Inc., 273 F.2d 447 (7 Cir. 1960); Ford Motor Co. v. Bradley Transp. Co., 174 F.2d 192 (6 Cir. 1949); 25 C.J.S. Damages § 91(1) (1966). Nor can objection be made to the method here utilized to arrive at the amount of the overhead and supervisory costs. By their very nature, overhead and supervisory expenses are not capable of ascertainment with the exactness and certainty which is possible in the case of materials and direct labor costs. In Baltimore & Ohio Railroad Co., *supra*, it was held that a railroad whose property was damaged in a crossing collision with a truck and which repaired the damages itself, could recover from the truck owner not only the direct expenses involved in repair but also the overhead expenses in-

cluding supervision as calculated on a percentage formula utilized by railroads in charging one another for repairs. See also, Ford Motor Co., *supra*.

 We are of the opinion that the trial court. erred in refusing to award plaintiff damages for its costs of overhead and supervision.

 The next contention made by plaintiff on its cross-appeal is that the trial court also erred in failing to award damages for certain claimed lost profits. The evidence shows that because plaintiff was required to use a less efficient kiln during the period required for repair of the damaged shuttle kiln, it produced some 302,220 defective "brick equivalents". The trial court awarded plaintiff some $9,030.33 for the cost of direct labor and materials which went into the manufacture of these defective wares, and this amount has not been questioned on appeal. However, plaintiff contends that it is entitled to recover profits lost because of the loss of sale of these defective products. We have reviewed the evidence and find that the trial court was justified in refusing to award any amount for damages for these alleged lost profits. While there is some evidence as to the amount of profit plaintiff would have made if the defective products had been sold, there is no evidence that the plaintiff could have sold any more bricks than it did sell. As far as the evidence shows, it is entirely conceivable that plaintiff completely satisfied its available market from the nondefective products marketed during the period involved.

In view of our conclusions the judgment of the trial court must be modified to provide for an award to plaintiff of additional damages as and for overhead and supervisory costs. Upon remand, the trial court is hereby directed to modify the judgment previously entered so as to award plaintiff additional damages in the amount of $3,680.55. Except as so modified the judgment of the trial court is affirmed.

EUBANK, P. J., and JACOBSON, J., concur.