337 P.2d 628

**J. M. KELLOGG and John Miller Williams, Appellants,**

**v.**

**James BOWEN and Phoenix Title & Trust Company, a corporation, Appellees.**

No. 6378.

Supreme Court of Arizona.

April 8, 1959.

Rehearing Denied June 9, 1959.

Herbert Mallamo, Phoenix, for appellants.

Raymond R. Wein and Irwin Cantor, Phoenix, for appellees.

JOHNSON, Justice.

This is an appeal by plaintiffs-appellants, J. M. Kellogg, a real estate broker, and John M. Williams, his salesman, from an adverse judgment entered by the trial court, sitting without a jury. The action was instituted to recover one-half of certain commissions paid to the defendant, James Bowen. The action was against James Bowen, a real estate broker, hereinafter called defendant, Dean Stanley and his wife, Frances H. Stanley, and Tyson Carter and his wife, Seraphine Carter. However, during the course of the trial plaintiff dismissed his complaint against the Carters and the Stanleys, and this appeal is only from the judgment entered in favor of the defendant, James Bowen.

The facts are that defendant, James Bowen, had listings on 60 acres of industrial property which was owned by Tyson Carter. These listings were dated January 20, 1954, which expired February 6, 1954; and another dated May 19, 1954, which expired on June 1, 1954.

J. M. Kellogg, through his salesman, Williams, hereinafter called plaintiff, had listings on two parcels of property belonging to Dean Stanley. These listings were for 30 days and were dated January 14, 1954; the listing for 360 acres expired on February 14, 1954, and for 160 acres expired on February 16, 1954, and were not thereafter renewed.

Plaintiff advertised Stanley's two parcels in a blind ad in the newspaper, and Carter answered and expressed interest in trading his industrial property for ranch land. On January 17, 1954, plaintiff showed Stanley's listed property and an adjoining 240-acre parcel also owned by Stanley, to Carter. Carter informed plaintiff that his industrial property was listed with defendant; however, a written exclusive listing was not given the defendant until January 20, 1954. Plaintiff, upon learning that defendant had an exclusive listing on Carter's industrial property, contacted defendant and he orally agreed to cooperate with plaintiff in effecting a sale or trade of the Stanley and Carter properties, and to split the commission fifty-fifty. However, the evidence is in dispute whether the exact parcels of Stanley's properties were mentioned. Plaintiff did not inform defendant that Stanley would not consider any trade or sale with Carter unless the industrial property could be sold immediately and as part of the same transaction.

On or about February 10, 1954, plaintiff, defendant and Carter met in defendant's office and a discussion was had primarily between Carter and plaintiff as to the value to be placed on the Carter industrial property. The defendant's exclusive listing on the Carter property had expired and plaintiff insisted that Carter sign a new listing. Carter refused, and because of the attitude and conduct of plaintiff became displeased

with him, left the meeting, and later informed defendant that he would have nothing more to do with plaintiff and did not want him in on any deal to be made in the future. This was the last time Carter saw the plaintiff. Stanley was not present during this meeting and the negotiations did not progress to the point where any sale or trade was discussed with him.

From February, 1954 to May, 1954, nothing further was done concerning any proposed transaction, and as testified by the defendant "There was not even the thought of a deal. If there had been, I would have gone back and gotten another listing, which the evidence shows I did. Each time I had a prospect, I got a listing."

After February, 1954, Carter attempted to sell or trade his own property but without success, and finally in May, 1954, again listed it with the defendant, explaining he wanted to make a trade rather than a sale because there would be a tax advantage. Carter gave the defendant the names of three prospects, including Stanley, who owned farm land and might be interested. Defendant contacted Stanley who expressed some interest in a purchase and trade, but would only trade if there was an immediate sale of the 60 acres of industrial property which he would receive in the trade.

From this time until the closing of the deal in December there were innumerable proposals and counterproposals between defendant, Stanley, Carter and Andrew Tell. The sale and trade that was finally agreed upon did not involve the same properties which had been originally discussed between defendant, Carter and plaintiff.

The final transaction which was closed in January, 1955, was as follows:

Stanley would sell to Carter the 360 acres, known as Ranch No. 11, for $88,740; Stanley would sell to Carter 240 acres in Section 19, for $48,000; each of these sales were set up in separate escrows with the Phoenix Title & Trust Company. In another separate escrow Carter transferred to Stanley the 60 acres of industrial property, and in another escrow Stanley sold the industrial property to Andrew Tell for $240,000.

The purchaser of the sixty acres of industrial property, Andrew Tell, had been a client of defendant for many years and had never had any dealings with plaintiff. It is undisputed that defendant did all the work and made all the contacts from May, 1954 to January, 1955, when the deal was finally concluded.

The defendant received a commission of $12,000, which was five per cent of $240,000, the price of the 60 acres of industrial property which had belonged to Carter, and plaintiff by this action sought to recover one-half of the commission paid.

At a pretrial conference it was stipulated by the parties and approved by the court that the following issues should be determined at the trial:

1. Whether or not there exists an agreement between the plaintiff, John Miller Williams, and the defendant, James Bowen, to share commissions on the sale or exchange of certain properties;

2. If there was such an agreement what properties, if any, did it concern;

3. What commissions, if any, are due to plaintiffs, J. M. Kellogg and John Miller Williams; and

4. From whom.

We will consider the first two issues.

*Was there an agreement to share commissions?*

The uncontradicted evidence reveals that the defendant agreed with the plaintiff to cooperate with him relative to the sale or trade of Stanley's listed property for the Carter property.

The following testimony of the defendant is conclusive on this issue:

"Q. With reference to cooperation, sir, was it agreed by you and Mr. Williams at that first discussion that you split a commission on the deal, any deal that you and he might be able to put over with respect to these two properties? A. Well, commission wasn't specifically discussed, but the word 'cooperation' means that you would do that, so there wasn't any need of discussing it.

\*    \*    \*.    \*    \*    \*

"Q. What share does the cooperating broker get out of such a deal? A. Customarily, 50% of the commission.

"Q. Fifty per cent. And that was your understanding, then, when Williams was in the office? A. That was my understanding."

The defendant also agreed to cooperate and assist in selling the industrial property belonging to Carter in the event Stanley acquired it in the transaction.

It therefore conclusively appears, without conflict, that there was an agreement between the parties to share in the commissions in the event of a sale or trade of Stanley's 360 acres and 160 acres and the industrial property of Carter.

*What properties did the agreement concern?*

The plaintiff originally had listings on 360 acres and 160 acres owned by Stanley, and at the time Carter contacted plaintiff to view the properties he had advertised in the newspaper, consisting of the two above-mentioned parcels, plaintiff also showed Carter a parcel of 240 acres belonging to Stanley, on the south side of Camel-

back, that was not listed with plaintiff. However, at this time plaintiff informed Carter that Stanley did not want to sell the 240 acres situated on the south side of Camelback as he wanted to set up a trust of such acreage for his grandchildren. There was also a discussion at this first meeting between plaintiff and Carter about the 60 acres of industrial property and the possibility of trading such property for Stanley's farm acreage listed with plaintiff.

There is a direct conflict in the evidence as to whether the 240 acres belonging to Stanley that was not listed with the plaintiff was ever discussed between plaintiff and defendant at their first meeting; and whether such parcel was discussed at the meeting in the defendant's office between Carter, plaintiff and defendant.

Plaintiff testified that on his first meeting with the defendant he drew plats of the property belonging to Stanley and that at the meeting in the defendant's office, in the presence of Carter, the listed and unlisted properties of Stanley were discussed, which included the parcel of 240 acres which was involved in the final transaction.

The defendant testified that no mention was ever made of the 240 acres in either meeting, and this is corroborated by Carter in the meeting that took place in defendant's office.

■ This court has repeatedly laid down the rule that where the evidence is in conflict we will not substitute our opinion thereof for that of the trial court; and that the evidence will be taken in the strongest manner in favor of the appellee, and if there is any reasonable evidence to support the judgment of the lower court it will be sustained. Sturges v. Tongeland, 83 Ariz. 148, 317 P.2d 941; Church v. Meredith, 83 Ariz. 377, 321 P.2d 1035; Kauffroath v. Wilbur, 66 Ariz. 152, 185 P. 2d 522; Viliborghi v. Prescott School Dist No. 1, 55 Ariz. 230, 100 P.2d 178.

■ The trial court upon this conflicting evidence found in favor of the defendant, thereby holding, in effect, that the 240 acres was not the property involved in the agreement between the plaintiff and defendant. No findings of fact having been requested or made, we must presume the trial court found every controverted issue of fact necessary to sustain the judgment, providing there was evidence in the record to support the same. Funk v. Spalding, 74 Ariz. 219, 246 P.2d 184, and Church v. Meredith, supra. It is well established in this jurisdiction that we are required to consider the evidence in the case in its strongest light to support the judgment rendered. We find, after a careful review of the record, that there was ample evidence from which the trial court might reasonably have found that the properties in-

310

volved in the final transaction were not the same properties as those included in the agreement to divide commissions; that all negotiations discussed under the original agreement between plaintiff and defendant had entirely terminated in February, 1954; and the negotiations culminating in the final transaction involved new terms, different property and different parties.

Plaintiff further contends that where real estate brokers agree to unite their efforts to make a sale or exchange of property and to divide the commission, their relationship becomes one of joint venturers, a fiduciary relation as in partnership, and that the acts of one become the acts of the other regardless of who is the procuring cause. It is not necessary to decide this contention for the reason that we have held that the trial court correctly found, upon conflicting evidence, that the final transaction was not the one contemplated in the original agreement between the plaintiff and defendant, and such being the case the parties hereto could not be joint venturers in the transaction finally concluded.

In view of the conclusions reached it is unnecessary to discuss the remaining issues presented by the pretrial order.

Judgment affirmed.

PHELPS, C. J., and STRUCKMEYER, UDALL, and BERNSTEIN, JJ., concurring.